1
2
3
4
5
6
7
8
9          **UNITED STATES DISTRICT COURT**
10        **SOUTHERN DISTRICT OF CALIFORNIA**
11

12  MCKINLEY KEKONA JR.,                    Case No. 22-cv-0745-MMA-VET

13                          Plaintiff,      **ORDER:(1) GRANTING IN PART**
                                            **AND DENYING IN PART**
14  v.                                      **DEFENDANTS' MOTION FOR**
                                            **SUMMARY JUDGMENT, OR IN**
15  CITY OF SAN DIEGO, et al.               **THE ALTERNATIVE, PARTIAL**
                                            **SUMMARY JUDGMENT;**
16                          Defendants.

17

18                                          [Doc. No. 46]

19
                                            **(2) DENYING PLAINTIFF'S**
20                                          **MOTION FOR PARTIAL**
                                            **SUMMARY JUDGMENT; AND**
21

22                                          [Doc. No. 48]

23
                                            **(3) DENYING DEFENDANTS'**
24                                          **MOTION TO FILE UNDER SEAL**

25                                          [Doc. No. 47]

26

27

28

Pending before the Court is Defendants Amanda Allen's, Jennifer Sowers', Carlo Dumaplin's, Phillipe Montayre's, Cameron Watson's (collectively, the "individual defendants"), and the City of San Diego's (the "City," and together with the individual defendants, "Defendants") motion for summary judgment, or, in the alternative, for partial summary judgment, Doc No. 46, as well as their motion to file under seal, Doc. No. 47. Also before the Court is Plaintiff McKinley Kekona Jr.'s ("Plaintiff") motion for partial summary judgment. Doc. No. 48. For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment, **DENIES** Defendants' motion to file under seal, and **DENIES** Plaintiff's motion for partial summary judgment.

## I. BACKGROUND[1]

Except where otherwise noted, the following facts are not reasonably in dispute. On the evening of May 25, 2020, Plaintiff was driving through a residential neighborhood in southeast San Diego. Doc. No. 55-1 at 46:17–48:15;[2] *see also* Doc No. 46-31 at 10. As Plaintiff drove, Defendants Carlo Dumaplin and Philippe Montayre, two San Diego Police Department officers, followed Plaintiff from behind for approximately two minutes before turning on their police lights and performing a traffic stop. Doc. No. 46-12 ("Dumaplin Depo. Tr.")[3] at 51:3–53:21; *see* Doc. No. 49 at Exhibit J ("Dumaplin First BWC") 0:00–2:06.[4] As they followed Plaintiff, Dumaplin and Montayre reached a top speed of 48 miles per hour and were traveling 36 miles per hour

---

[1] These material facts are taken from the parties' separate statements of undisputed facts and responses thereto, as well as the supporting declarations and exhibits. Facts that are immaterial or not genuinely disputed for purposes of resolving the current motions are not included in this recitation. To the extent any such facts are nevertheless relevant to the Court's analysis, they are discussed as appropriate *infra*.
[2] All citations to deposition transcripts refer to the pagination assigned by the reporter as well as the corresponding line numbers. Additionally, the Court hereinafter refers to Plaintiff's deposition transcripts, offered at Doc. Nos. 55-1, 46-25, 62-4, and 71-5, as "Pl. Depo. Tr."
[3] The Court hereinafter refers to Defendant Dumaplin's deposition transcripts, offered at Doc. Nos. 46-12, 55-2, 62-5, and 71-1, as "Dumaplin Depo. Tr."
[4] All body worn camera footage submitted as exhibits is labeled as "BWC." All citations to body worn camera footage refer to the time within the video files, rather than the timestamp noted on the footage, unless otherwise indicated.

at the time they turned on their police lights to initiate the stop.  Dumaplin First BWC 1:43–1:52.

Within approximately 13 seconds of the officers turning on their lights, both Plaintiff and the officers came to a complete stop.  *Id.* 1:51–2:04.  The officers exited their vehicle and approached Plaintiff's stopped car, making contact with Plaintiff.  *Id.* 2:04–2:44.  Upon Dumaplin's request, Plaintiff turned off his car and produced his driver's license.  *Id.* 2:44–3:00, 3:31–3:44.  Dumaplin inquired of Plaintiff why he believed he had been pulled over, to which Plaintiff responded that he had dropped his phone and "kn[e]w [he] was driving a little erratically."  *Id.* 3:00–3:12.  Plaintiff and Dumaplin disagreed over whether Plaintiff ran a stop sign, which Plaintiff denied.  *Id.* 3:12 –3:16.  Asked why he was "going so fast," Plaintiff responded that he "knew [he] was going fast," but that he was trying to "get somewhere" and dropped his phone.  *Id.* 3:16–3:27.  Dumaplin further engaged Plaintiff with questions regarding his driving before returning to his police vehicle.  *Id.* 3:27–4:50.  Dumaplin remained at his vehicle for approximately one and a half minutes before returning to Plaintiff's car.  Doc. No. 46-16 at Exhibit 5 ("Montayre BWC") 4:35–6:07.

While Dumaplin was at his vehicle, Montayre remained at Plaintiff's vehicle, with Plaintiff inside.  Montayre BWC 4:35–6:07.  Upon his return to Plaintiff's car, Dumaplin inquired as to whether Plaintiff had consumed any alcoholic beverages that evening, which Plaintiff denied.  Doc. No. 49 at Exhibit K ("Dumaplin Second BWC") 1:10–1:18.  Dumaplin offered to "help [Plaintiff] squash it" if Plaintiff admitted to consuming alcohol, which Plaintiff again denied, stating "[w]hat you want to do, get me out of the car?  You can search the car if you want."  *Id.* 1:18–1:33.  Dumaplin returned to his car and radioed to other officers regarding the stop.  *Id.* 1:33–2:35; Dumaplin Depo. Tr. 72:2–73:22.  He, via cell phone, specifically requested that Defendant Jennifer Sowers respond to the scene.  *Id.*; Doc. No. 55-4 ("Sowers Depo. Tr.") 44:3–48:23.[5]  At or

---

[5] The Court hereinafter refers to Defendant Sowers' deposition transcripts, offered at Doc. Nos. 46-18, 55-4, 62-7, and 71-4, as "Sowers Depo. Tr."

around this time, Defendant Cameron Watson, also a San Diego Police Department officer, arrived. Doc. No. 46-21 at Exhibit 10 ("Watson BWC") 0:00–0:40. Watson approached Plaintiff's car and briefly engaged Plaintiff verbally. *Id.* 2:30–3:00.

Sowers and her partner, Defendant Amanda Allen, arrived together shortly thereafter. Dumaplin Second BWC 4:28; Sowers Depo. Tr. 153:3–153:4. Sowers engaged with Plaintiff verbally and inquired as to whether he had been drinking and whether "there was a reason that [she could] smell alcohol." Doc. No. 49 at Exhibit I ("Sowers Second BWC") 1:08–1:14.[6] Plaintiff responded, "you think I had alcohol . . . too much alcohol on me? You can test that you can do whatever you want." *Id.* 1:15–1:26. Sowers asked if Plaintiff would be willing to take "an eval," to which Plaintiff said no. *Id.* 1:26–2:01. After discussion, Plaintiff further confirmed that he was not willing to participate in a field sobriety test and Sowers ordered him out of his car. *Id.* 2:40–2:48. Plaintiff exited the car. *Id.* 2:48–2:53. Dumaplin then ordered Plaintiff to face towards his car, which Plaintiff did while Dumaplin placed handcuffs on him, with his arms behind his back. *Id.* 2:53–3:07.

Plaintiff and the individual defendants then engaged in extended argument while Sowers and Dumaplin began frisking Plaintiff. *Id.* 3:07–4:24. Sowers and Dumaplin began arguing with Plaintiff about his physical positioning against the car. Dumaplin Second BWC 8:10–8:29; Sowers Second BWC 4:10–4:30. For example, as Dumaplin and Sowers repeatedly ordered Plaintiff to stop moving, Plaintiff repeatedly stated that his "chest was on the car." *Id.* Plaintiff then placed his left leg and foot on the lower part of the interior doorframe. Dumaplin Second BWC 8:29–8:41. Dumaplin ordered Plaintiff three times to put his leg back on the ground, stating Defendants would "take him to the ground," to which Plaintiff responded "whatcha gonna do? Whatcha gonna do? I'm already on the fucking [inaudible]—." Sowers Second BWC 4:20–4:36. At that point, Dumaplin, Sowers, and Watson took Plaintiff to the ground. *Id.*; Dumaplin Second

---

[6] The Court notes that the parties present Defendant Sowers' body worn camera footage labeled in opposite orders.

BWC 8:41–8:47; Watson BWC 5:55–6:38.  In doing so, Dumaplin placed his left hand on the left side of Plaintiff's upturned head, as he applied force downward from behind, landing atop Plaintiff on the ground.  Dumaplin Second BWC 8:29–8:48; Watson BWC 05:30–06:38.  Dumaplin likewise wrapped his right arm around Plaintiff's neck, in a "head lock," using his weight to bring Plaintiff to the ground.  Dumaplin Depo. Tr. 96:11–97:5.

At some point before Plaintiff hit the ground, Watson, standing behind Allen on Plaintiff's right side, moved his hands to either side of Plaintiff's head—where they remained for approximately one minute after Plaintiff was on the ground.  Watson BWC 6:36–7:24.  As Plaintiff lay on the ground, Dumaplin and Sowers maintained at least some bodyweight on top of him, with Dumaplin's knee on Plaintiff's back for the entirety of his time on the ground.  Sowers Second BWC 5:00–6:13; Sowers Depo. Tr. 145:15–145:25.  Meanwhile, Montayre held down Plaintiff's right leg while Allen restrained Plaintiff's left and searched his lower body.  Montayre BWC 13:10–15:25; Doc. No. 71-2 ("Allen Depo. Tr.")[7] at 4–8.[8]  Watson held hands on the back of Plaintiff's head, holding him to the ground.  Watson BWC 6:36–7:25; Sowers Second BWC 5:00–6:13.  Dumaplin remained with his hand on Plaintiff's upper back, doing the same.  *Id.*  As Allen searched Plaintiff's body and attempted to remove a bracelet from his arm, the bracelet broke.  Doc. 46-6 ("Allen Decl.") ¶ 13; Montayre BWC 14:00–14:11.  In total, Plaintiff remained on the ground for just under two minutes.  Sowers Second BWC 4:30–6:20.  The individual defendants then collectively picked Plaintiff up off the ground and walked him to a police car, where Sowers belted him into the back seat and informed him that he was being placed under arrest for driving under the influence.  Dumaplin Second BWC 10:37–11:23.  While seated in the police car, Plaintiff can be seen with a bleeding

---

[7] The Court refers Defendant Allen's deposition transcripts, offered at Doc. Nos. 55-5, 62-8, and 71-2, collectively as "Allen Depo. Tr."

[8] Doc. No. 71-2 is not paginated with court reporter page numbers.  Thus, the Court refers to the CM/ECF paginations for this exhibit.

mouth, a wound to his inner top lip, and two wounds above his right eye. *Id.* 10:40–10:41; Sowers Second BWC 6:20–6:57; *see* Doc. No. 55-9 at 7.  He likewise suffered an abrasion to his knee.  *See* Doc. No. 55-9 at 8; *see also* Doc No. 53-1 (Defendants' Response and Opposition to Plaintiff's Separate Statement, "PSS") at 19.

Searching Plaintiff's trunk at the scene, Watson removed several items, including two empty cans of Modelo beer and one White Claw alcoholic beverage.  Watson BWC at 12:30–13:40.  Montayre, searching the car's main cabin, removed a cell phone, wallet, and keys.  Doc. No 55-3 ("Montayre Depo. Tr.")[9] 72:6–72:17.  In total, the search included the entirety of both the trunk and passenger cabin.  Doc. No. 49 at Exhibit N ("Kelton and Pyramid 4 BWC")[10] 10:00–14:45; Doc. No 49 at Exhibit M ("Kelton and Pyramid BWC").

Plaintiff's car was impounded as a result of the stop and his subsequent arrest.  Pl. Depo. Tr. 74:14–74:22; *see generally* Doc. No. 55-12.

Approximately three hours after the arrest, according to internal video timestamps, Sowers administered Plaintiff an "intoxilyzer" breathalyzer test.  Doc. No. 49 at Exhibit H ("Sowers First BWC") 0:00–4:57.  The result reading on that test, just before Sowers shut off her body-worn camera, moves between 0.045 and 0.047 before the readout flashes off the intoxilyzer machine.  *Id.* 4:57–5:05; Sowers Depo. Tr. 166:7–166:16.

## II. Evidentiary Objections

Plaintiff objects to several of Defendants' undisputed facts.  *See generally* Doc. No. 62-2 ("DSS").  The Court **OVERRULES** Plaintiff's objections in their entirety, as they are boilerplate objections devoid of any specific analysis and, in general, are not directed at any particular piece of evidence but rather state objections to Defendants' facts themselves.  *See Amaretto Ranch Breedables v. Ozimals Inc.*, 907 F. Supp. 2d 1080,

---

[9] The Court refers to Defendant Montayre's deposition transcripts, offered at Doc. Nos. 46-15, 55-3, and 62-6, collectively as "Montayre Depo. Tr."
[10] This video, though not labeled as such, appears from its angles to be a second file of Watson's body worn camera video.

1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development."). A party's separate statement of undisputed material facts is not evidence, but a tool designed to assist courts with determining whether the moving party has met their burden. At summary judgment, courts rely on the underlying evidence, not the statements contained within a separate statement of undisputed material facts. *Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1084 (E.D. Cal. 2016) ("The court's decision relies on the evidence submitted rather than how that evidence is characterized in the statements."); *AFMS LLC v. UPS Co.*, 105 F. Supp. 3d 1061, 1071 (C.D. Cal. 2015). Parties should direct challenges directed at the evidence supporting those statements, rather than the statements themselves. *See Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1126 n.1 (E.D. Cal. 2008) (noting that the parties' "evidentiary objections to [their adversary's] separate statements of undisputed facts are not considered because such objections should be directed at the evidence supporting those statements")). Plaintiff's objections simply do not meet these requirements and the Court thus summarily overrules them.

To the extent that the Court can discern the specific objections Plaintiff makes to Defendants' evidence, rather than the facts, it will resolve them. "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). However, at the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence as presented would not be admissible at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) (explaining that at summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial"). Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004)). For these reasons, objections such as lack of foundation, speculation, hearsay,

relevance, or that evidence is argumentative or constitutes an improper legal conclusion "are all duplicative of the summary judgment standard itself" and unnecessary to consider here. *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); *see also Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1107 (S.D. Cal. 2018) (collecting cases).

First, the Court **OVERRULES** Plaintiff's speculation and lack of foundation objections to DSS Nos. 9, 13, 16, 17, 19, 22, 28, 33. As discussed, objections such as lack of foundation, speculation, hearsay, relevance, or that evidence is argumentative or constitutes an improper legal conclusion "are all duplicative of the summary judgment standard itself" and unnecessary to consider here. *Burch*, 433 F. Supp. 2d at 1119. With respect to Defendants' undisputed fact No. 34, Plaintiff's objections are unnecessary as this statement does not rely on any evidence in the record. *Id.*

The Court likewise **OVERRULES** Plaintiff's hearsay objections, DSS Nos. 9–13, 18, 22, 28, 32–33, for the same reason. The evidence underlying the facts to which Plaintiff objects are body worn camera footage and deposition transcripts, officer reports written after the incident, witness declarations, and Defendants' expert report. First, video evidence is not, in and of itself, a statement or assertion to which the rule against hearsay is applicable. *See P.A. v. United States*, No. C 10-2811 PSG, 2013 WL 3864452 *5 (N.D. Cal. Jul. 24, 2013). Second, the contents of the other exhibits are statements from the individual defendants regarding their firsthand knowledge of events at issue in this lawsuit that are, in one way or another, admissible for non-hearsay purposes or through exceptions to the rule against hearsay, even if the form of the evidence may not be.[11] *See, e.g., Fraser*, 342 F.3d at 1036–37 (accepting a diary at summary judgment as its contents "could be admitted into evidence at trial in various ways" including testimony as to the contents by personal knowledge, to refresh the witness's recollection, or as a recorded recollection). Additionally, an expert's opinion is not inadmissible

---

[11] For example, through the Defendants' own in-court testimony or as statements of a party opponent under Federal Rule of Evidence 801(d)(2).

merely because it relies on hearsay. *See Erhardt v. Bofl Holding, Inc.*, 445 F. Supp. 3d 831, 839–40 (S.D. Cal. 2020). As the expert can take the stand to deliver his opinions at trial, this evidence is, in some form, admissible.

Finally, Plaintiff objects to DSS Nos. 12, 18, 20, 21, 27, 33 and evidence in support, on the basis that these statements and evidence are "Incomplete Evidence/Out of Context," citing Federal Rule of Evidence 106. The Court **OVERRULES** these objections. Federal Rule of Evidence 106 states, in full: "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." Fed. R. Evid. 106. This rule has no apparent relevance to evidence offered at the summary judgment stage and does not command that a statement be excluded from the Court's consideration at that time. Instead, Federal Rule of Evidence 106 contemplates the adverse party's ability to further introduce other parts of the challenged statement as the cure available for that statement's admission. *Id.* Thus, employing it to exclude evidence at summary judgment is not appropriate.

### III. REQUEST FOR JUDICIAL NOTICE

Plaintiff, in response to Defendants' motion for summary judgment, seeks judicial notice of three exhibits reflecting the San Diego City Council's resolutions approving settlement in three lawsuits: (1) "Approval of the City of San Diego's settlement with civil rights plaintiff Rashid Adan"; (2) "Approval of the City of San Diego's settlement with civil rights plaintiff Gregory McNally"; and (3) Approval of the City of San Diego's settlement with civil rights plaintiff Eric Ball. Doc. No. 59; *see also* Doc. No. 62 at 22–23. Defendants do not respond to Plaintiff's request.

A judicially noticeable fact is one that is not subject to reasonable dispute because it is generally known within the jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). This can include information on government websites, as well as "official acts" of

government officials, legislatures, or agencies. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010); *Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1070–71 (S.D. Cal. 2021); *Greenfield MHP Assocs., L.P. v. Ametek, Inc.*, 145 F. Supp. 3d 1000, 1007 (S.D. Cal. 2015). Plaintiff includes copies of these documents and links to online PDF versions under the City's official URL domain. Doc. No. 59; Doc. Nos. 59-2–59-4. As the documents represent both information on government websites and official resolutions by the City of San Diego's legislative body, the Court **GRANTS** Plaintiff's request for judicial notice of these documents.

Likewise, as the cases underlying these documents constitute court records, the Court takes judicial notice of the docket and filings in the following cases: *Adan v. City of San Diego, et. al*, 19-cv-1523-LAB-AHG; *McNally v. Riis*, 18-cv-1150-BEN-AGS; and *Ball v. City of San Diego, et al.*, 21-cv-0498-GPC-BGS. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

## IV. LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The court draws all justifiable inferences in favor of the non-moving party." *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party." *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248). The court may not weigh the evidence or assess the credibility of witnesses. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S.

at 255).  However, when dealing with unaltered video evidence of the events at the heart of the dispute, like here, if "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment" and view the facts in the light the video depicts.  *Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of material fact exists.  *Devereaux*, 263 F.3d at 1076.  More than a "scintilla of evidence" must exist to support the non-moving party's claims.  *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477 U.S. at 252).  A showing of merely "some 'metaphysical doubt' as to the material facts as issue" will not suffice.  *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Pomona*, 750 F.3d at 1049–50 (quoting *Matsushita*, 475 U.S. at 587).

Where, as here, the parties have filed cross-motions for summary judgment, "each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation omitted).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion."  *Id.*

## V. DISCUSSION

Defendants move for summary judgment in their favor as to all of Plaintiff's claims.  *See* Doc. No. 46.  Plaintiff, on the other hand, moves for summary judgment only as to his Fourth Amendment excessive force claim.  Doc. No. 48.  The Court addresses these claims and the parties' arguments in turn.

## A.    Constitutional Violations

Plaintiff's first, second, third, fourth, and sixth claims are for violations of his constitutional rights, and he brings these claims against the individual defendants pursuant to 42 U.S.C. § 1983.  To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove that the defendant, while acting under color of state law, deprived the plaintiff of a right or privilege conferred by the Constitution of the United States.  *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) (citing 42 U.S.C. § 1983).  An official deprives a plaintiff "of a constitutional right, within the meaning of [S]ection 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  A defendant's liability under Section 1983 requires their integral participation in the alleged violation. *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).  This does not require that the defendant's actions themselves must rise to the level of a constitutional violation but does require some fundamental involvement in the conduct in question.  *Id.*

The parties do not appear to dispute that the individual defendants were acting under color of law throughout the series of events underlying the pleadings, as they were acting in their capacity as San Diego Police Department officers.  Instead, Defendants assert that the individual defendants did not deprive Plaintiff of his rights.  Additionally, the individual defendants assert they are entitled to qualified immunity.

### 1.    *Deliberate Indifference – Claim 6*

Defendants seek summary judgment in their favor as to Plaintiff sixth cause of action, for deliberate indifference to his serious medical needs.  Doc No. 46-1 at 29–31. Plaintiff concedes dismissal on this cause of action.  Doc. No. 62 at 6.  Therefore, because Plaintiff does not oppose summary judgment as to this claim, the Court **GRANTS** Defendants' motion as to Plaintiff's deliberate indifference claim.

//

//

### 2.    Excessive Force – Claim 1

Next, Defendants seek summary judgment on Plaintiff's first cause of action, for excessive force in violation of the Fourth Amendment. Doc. No. 46-1. Plaintiff, conversely, seeks summary judgment in his favor on this cause of action. Doc. No. 48. Claims that an officer used excessive force "in the course of making an arrest, investigatory stop, or other 'seizure'" of an individual's person are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 394–95 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). Courts in the Ninth Circuit examining excessive force claims: (1) assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted; (2) evaluate the government's interest in the use of force; and (3) "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). The most important factor is whether the plaintiff "posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). However, the Court must consider the totality of the circumstances and any factor that may be relevant to the facts at hand. *Id.* These other factors frequently include whether officers gave the plaintiff warning to desist with objectionable behavior prior to employing force, and whether less intrusive means were available to officer at the time. *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012); *Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir. 1994) (noting, however, that "[p]olice officers . . . are not required to use the least intrusive degree of force possible.").

"Reasonableness" in any specific scenario "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]" and cannot consider an officer's subjective intentions in carrying out the act of force.

*Graham*, 490 U.S. at 396–97; *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). Due to the fact heavy nature of this analysis, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Glenn*, 673 F.3d at 871 (quoting *Smith v. City of Hemet*, 394 F.d. 689, 701 (9th Cir. 2005) (*en banc*)).

### i.   <u>Defendants' Motion</u>

Defendants argue that their use of force was objectively reasonable. Plaintiff disagrees. In this fact-specific inquiry, the parties' arguments for and against Defendants' motion are based on their different factual presentations of the events in question. *See* Doc. No. 46-1 at 13–19; Doc. No. 62 at 10–16.

First, the parties disagree as to the severity of the intrusion and degree of force exerted against Plaintiff. "The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to the type and amount of force inflicted." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (internal quotation marks omitted). In Plaintiff's telling, Defendants "slammed [him] to the ground," and held him there with such force and weight that it broke his braces, cut his mouth, and cut him above his eyebrow. Pl. Depo. Tr. 55:20–56:24. Defendants present a different story in which they merely "guide[]" Plaintiff to the ground and then maintain control over his body as he continued to move. DSS at 13–21; *see, e.g.*, Dumaplin Depo. Tr. 96:7–97:24. While Defendants clearly do more than merely pick Plaintiff up and lay him down, the quick movements and moving perspectives in the videos do not conclusively resolve this dispute. *See, e.g.*, Dumaplin Second BWC at 8:41–8:47; Watson BWC 5:55–6:38; Montayre BWC 12:20–13:41. Viewing the evidence in the light most favorable to the Plaintiff as the non-movant— including Dumaplin's testimony that he placed Plaintiff in a head lock and used his weight to take Plaintiff to the ground, Dumaplin Depo. Tr. 96:11–97:5—and the evidence of Plaintiff's injuries following his time on the ground, a reasonable jury could find the force used was substantial and potentially excessive. *See, e.g.*, *Winterrowd v. Nelson*, 480 F.3d 1181, 1182–83 (9th Cir. 2007); *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th

Cir. 2003); *Westfall v. Luna*, 903 F.3d 534 (5th Cir. 2018); *Raiche v. Pietroski,* 623 F.3d 30, 36–37 (1st Cir. 2010).

Second, examining the government interests at stake, the Court analyzes "(1) how severe the crime at issue is, (2) whether the [plaintiff] posed an immediate threat to the safety of the officers or others, and (3) whether the [plaintiff] was actively resisting arrest or attempting to evade arrest by flight." *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014) (quoting *Mattos*, 661 F.3d at 441).

Under either party's assertion of the facts, Plaintiff's crime was not a serious one. Courts throughout the Ninth Circuit have concluded that driving under the influence, for which Plaintiff was arrested, "provides little basis for the use of force." *Lopez v. City of Imperial*, No. 13-CV-00597-BAS WVG, 2015 WL 4077635 *8 (S.D. Cal. Jul. 2, 2015) (collecting cases). This factor thus weighs against the reasonableness of the individual defendants' use of force.

A genuine dispute exists, however, as to whether Plaintiff posed a threat to officers. Plaintiff asserts that he was at most "passively resistant" to the individual defendants' commands and posed no threat to them.[12] DSS at 14–19; Pl. Depo. Tr. 55:20–56:24. Defendants argue that Plaintiff did pose a threat to them as they searched him before taking him down. *See* DSS at 18; Doc. No. 46-8 ("Dumaplin Decl.") ¶ 15. But Defendants' evidence reveals internal contradictions. The following exchange during Dumaplin's deposition is instructive:

> Q: Okay. Did you take him down to the ground because you believed that he posed a threat of harm at that point?

---

[12] "Passive resistance," as a legal concept, is exemplified in *Nelson v. City of Davis*: "As our prior cases illustrate, active resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders. To the contrary, where an individual's "resistance was [not] particularly bellicose" . . . we have held that various applications of force, including the use of pepper spray . . . and bean bag projectiles . . . were not reasonable. Therefore, even if [Plaintiff] heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance." 685 F.3d at 882.

1
2
    A:  No.  We took him down to the ground after warning him because we still needed to conduct our search of his person.

3
Dumaplin Depo. Tr. 105:15 –105:20.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
    Dumaplin then states in his declaration, that "[b]ecause I was concerned with the safety of myself and the other officers, I directed that Mr. Kekona be 'taken to the ground.'" Dumaplin Decl. ¶ 15.  Defendants also assert that Plaintiff grabbed an officer's wrist as he lay on the ground and refused to release it, leading Defendant Allen to warn Plaintiff that she would break his fingers if he continued.  Dumaplin Depo. Tr. 104:16–104:18; Allen Depo. Tr. at 5–6.[13]  In Plaintiff's telling, Defendant Allen threatened to break his fingers unprompted.  Pl. Depo. Tr. 58:17–59:6.  Likewise Plaintiff was handcuffed prior to the takedown and remained so as he lay on the ground.  Sowers Second BWC 2:53–3:07.  Due to this fact, a jury could find that any threat he could pose to officers was substantially lessened.  Viewing the evidence in the light most favorable to Plaintiff, the Court cannot say that Plaintiff indisputably posed a threat before they took to the ground, or once on the ground.  *Spencer v. Pew*, 117 F.4th 1130, 1144 (9th Cir. 2024) ("Although [the plaintiff] continued to move somewhat on the ground, he was handcuffed and surrounded by multiple officers, and a jury could reasonably conclude that he was no longer providing any serious resistance and that 'he posed only a minimal threat to anyone's safety.'").

20
21
22
23
24
25
26
    Additionally, the parties genuinely dispute the degree to which Plaintiff may have resisted officers.  Plaintiff contends that, during his entire interaction with officers, he generally complied with their commands and was, at most, passively resistant.  DSS at 14–19; Pl. Depo. Tr. 55:20–56:24; Montayre Depo. Tr. 58:16–58:24, 60:20–60:21, 62:5–62:8; *see also* Doc. No. 62 at 11 (characterizing Plaintiff's behavior as "passively resisting").  Under Defendants' versions of the facts, Plaintiff began to "tense," move backwards towards the individual defendants, place his foot inside his car against the

27
28

---

[13] *See supra* note 8, regarding pagination citations for Doc. No. 71-2.

individual defendants' commands, tense further while on the ground, and tried to get up again while the individual defendants held him down. DSS at 13–19; *see, e.g.*, Doc. No. 46-9 ("Sowers Decl.") ¶ 15; Montayre Depo. Tr. 60:7–60:19, 64:3–65:13. The evidence presented in support the parties' factual assertions, including the body camera footage that all parties rely upon, does not definitively demonstrate whether Plaintiff did or did not act in this manner.[14] While the body worn camera footage, as discussed above, provides undisputed evidence that Plaintiff argued with the individual defendants as they handcuffed and searched him, *see, e.g.*, Dumaplin Second BWC 8:10–8:29, Sowers Second BWC 4:10–4:30, it is unable to capture the less-obvious points of the encounter—including whether Plaintiff "braced" or "tensed" and whether he moved towards officers. Likewise, it is not clear whether Plaintiff's moving his feet prior to being taken down was purely voluntary in defiance of the officers' orders, or whether it was caused by the officers pressing Plaintiff forcefully against his car, as Plaintiff contends. *See* Pl. Depo. Tr. 56:12–56:24.

Additionally, Defendants put forward evidence that the individual defendants gave Plaintiff several warnings to desist his behavior before actually using force. The video footage reveals they stated multiple times that they would "take him to the ground" if he did not stop moving as they searched him. Sowers Second BWC at 4:20–4:36. However, as Plaintiff contends in opposition and as discussed above, a reasonable jury could find that Plaintiff was not actually resisting arrest and therefore that he could not heed these warnings and avoid being taken down. Thus, this factor's resolution depends upon the factfinder's determination regarding the issues discussed above.

These factual disputes, once resolved, will provide a balancing point against which to weigh the force applied against Plaintiff. However, in the light most favorable to Plaintiff, a reasonable jury could find that, under the circumstances and weighing the force used against the government's interest, multiple officers, with one utilizing his

---

[14] Indeed, even the individual defendants' testimony is, at times, contradictory as to Plaintiff's behavior. *See, e.g.*, Montayre Depo. Tr. 58:16–58:24, 60:1–60:21, 62:5–62:8.

bodyweight and a head lock, taking a handcuffed individual—suspected of DUI and merely passively resisting officers—to the ground and then holding him there with such force that it left cuts on his head, mouth, and legs, was unreasonable. *See, e.g.*, *Meredith*, 342 F.3d at 1061; *see also Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)[15] ("Force is excessive when it is greater than is reasonable under the circumstances . . . .  We have held, for example, that the overly tight application of handcuffs can, depending on the circumstances, constitute a violation of the Fourth Amendment . . . .  Here, the jury must determine not only whether the officers were justied in using force at all, but, if so, whether the degree of force actually used was reasonable.") (internal citations omitted); *Lopez*, 2015 WL 4077635 at *11 ("Ninth Circuit case law makes clear that passive or minor resistance to arrest alone does not constitute an immediate threat justifying the use of intermediate force.").  Likewise, the question of whether less intrusive means were available will also depend on the resolution of the above-discussed factors.  Unlike cases in which defendants employ firearms or other overwhelming force on an unarmed plaintiff, the universe of less-intrusive force available here is smaller, and the Court cannot readily determine its availability without first resolving factual disputes regarding Plaintiff's degree of resistance and threats to officer safety and the degree of force that the officers actually applied—something the Court may not do.

Finally, should it find that a constitutional violation occurred, a reasonable jury could find that each individual defendant "integrally participat[ed]" in that violation such that they are all liable.  *See Boyd*, 374 F.3d at 780 ("'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional

---

[15] The Court notes that the concurrence in *Sabbe v. Wash. Cnty. Bd. of Comm'rs* indicates that *Santos* was overruled (at least in part) by *Pearson v. Callahan*, 555 U.S. 223 (2009).  84 F.4th 807, 831 (9th Cir. 2023) (Berzon, J. concurring).  Reviewing *Pearson*, the Court does not find any direct repudiation of *Santos*, and rather assumes Judge Berzon refers to the *Pearson* Court's holding repudiating process that mandates a court must "[f]irst . . . decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right . . . [and] [s]econd, if the plaintiff has satisfied this first step . . . decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct." when deciding whether to grant Defendants qualified immunity.  *Pearson*, 555 U.S. at 232–43.

violation."); *see, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (finding that an officer who helped to handcuff Plaintiff integrally participated to a degree sufficient for liability, as "his help in handcuffing [Plaintiff] was instrumental in the officers' gaining control of [Plaintiff], which culminated in [another defendant's] application of hobble restraints"—the alleged violation); *see also Peck v. Montoya*, 51 F.4th 877, 888–892 (9th Cir. 2022). In *Boyd*, the Ninth Circuit held that officers, though they had not thrown the "flash bang" device themselves—the act which ostensibly violated the plaintiff's rights—had integrally participated in that violation because they

> stood armed behind [the thrower] while he reached into the doorway and deployed the flash-bang. Second, the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way. Third, every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed.

*Boyd*, 374 F.3d at 780.

Here, the individual defendants had substantially similar involvement in the alleged constitutional violation. A review of the body worn camera footage reveals Dumaplin, Sowers, Allen, Montayre, and Watson all physically assisted in searching, handcuffing, and/or holding Plaintiff before the takedown, and all assisted in holding him down on the ground after the takedown and during the subsequent search. *See* Sowers Second BWC 5:00–6:13; Sowers Depo. Tr. 145:15–145:25; Montayre BWC 13:10–15:25; Allen Depo. Tr. at 4–8;[16] Watson BWC 6:36–7:25. Though, based on the video footage, Defendants Allen and Montayre did not physically have hands on Plaintiff during the takedown itself (as the remaining parties gravitated out of their reach), Montayre BWC 12:20–13:41, no defendant merely stood by or failed to object. Instead, the evidence reveals that all physically participated in taking Plaintiff down and/or

---

[16] *See supra* note 8, regarding pagination citations for Doc. No. 71-2.

holding him to the ground.  Indeed, both Allen and Montayre rushed towards Plaintiff and the remaining individual defendants to hold Plaintiff down again once he was on the ground.  *Id*.  Each individual defendant exerted force on Plaintiff until the end of the events Plaintiff claims constituted excessive force.  Defendants do not argue otherwise: in their motion for summary judgment and opposition to Plaintiff's motion for partial summary judgment, Defendants do not attempt to separate their individual degrees of liability as it relates to Plaintiff's excessive force claim.  Doc. No. 46-1 at 13–21; *see generally* Doc. No. 53.  Thus, a reasonable jury could find that each defendant was "integrally involved" in the violation of Plaintiff's rights.

For these reasons, the Court **DENIES** Defendants' motion for summary judgment as to Plaintiff's excessive force claim.

### ii.    <u>Plaintiff's Motion</u>

Plaintiff moves for summary judgment only on his excessive force claim.  Having considered the evidence put forth in support and opposition to the motion in addition to the evidence supporting and opposing Defendants' motion, and having considered Plaintiff's arguments in favor of summary judgment on this claim, the Court finds that the same unresolved disputes that prevent the Court from granting Defendants' motion also prevent the Court from granting Plaintiff's motion for summary judgment.

Though it is undisputed that the individual defendants took Plaintiff to the ground, there exists a genuine dispute as to the degree of force the individual defendants used to accomplish the takedown.  Taking the evidence in the light most favorable to Defendants, a jury could find that the degree of force used was minimal.  *See,* DSS at 13–21; *see, e.g.*, Dumaplin Depo. Tr. 96:7–97:24; Dumaplin Second BWC at 8:41–8:47; Watson BWC 5:55–6:38; Montayre BWC 12:20–13:41.

Additionally, as discussed above and in contrast to Plaintiff's assertions that "the [individual] [d]efendant[s] . . . could not have reasonably found Mr. Kekona to have been more than merely passively resisting," Doc. No 48 at 11, there exists a triable dispute as to whether Plaintiff began to "tense," move backwards towards the officers, placed his

foot inside his car against their commands with intent to escape, tensed further while on the ground, and tried to get up again while the individual defendants held him down. DSS Nos. 15–24; *see, e.g.*, Doc. No. 46-9 ("Sowers Decl.") ¶ 15; Montayre Depo. Tr. 60:7–60:19, 64:3–65:13. Viewing the evidence in the light most favorable to Defendants, a jury could find that the level of force employed was minimal and that the government had a substantial interest in preventing Plaintiff from escaping or further physically resisting as they searched him. Moreover, the individual defendants' statements that they would take Plaintiff to the ground could also reasonably be viewed as a warning to Plaintiff prior to invoking force, further weighing in Defendants' favor.

With that in mind, a reasonable jury could find that, under the circumstances, the officers' level of force was necessary to prevent Plaintiff from escaping or harming officers. As with Defendants' motion, these disputes must be resolved to properly "balance the gravity of the intrusion on the individual against the government's need for that intrusion" and determine whether they were objectively reasonable under the circumstances. *Glenn*, 673 F.3d at 871. Therefore, the Court **DENIES** Plaintiff's motion for summary judgment.

### 3. *False Arrest – Claim 2*

As to Plaintiff's second claim, an arrest made without probable cause violates the Fourth Amendment, and thus gives rise to an action for damages under Section 1983. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011). Conversely, the existence of probable cause creates an absolute defense to a false arrest claim. *See Hutchinson v. Grant*, 796 F.2d 288, 290 (9th Cir. 1986) ("A police officer has immunity if he arrests with probable cause."). Indeed, an officer need not even have probable cause for the arresting offense, so long as probable cause exists to justify arresting the plaintiff for some offense. *See Edgerly v. City & Cnty. of San Francisco,* 599 F.3d 946, 953–56 (9th Cir. 2010); *Guapo-Villegas v. City of Soledad*, No. 24-CV-00575-VKD, 2024 WL 4093919 *4–5 (N.D. Cal. Sept. 4, 2024) (examining a Plaintiff's arrest for driving under the influence).

> An officer has probable cause to make a warrantless arrest when the facts and circumstances within his knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime. The analysis involves both facts and law. The facts are those that were known to the officer at the time of the arrest. The law is the criminal statute to which those facts apply.

*Edgerly*, 599 F.3d at 953 (internal citations omitted). "The evidence need support only the probability, and not a *prima facie* showing, of criminal activity . . . and such evidence need not be admissible, but only legally sufficient and reliable . . . ." *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002) (internal citations and quotation marks omitted).

The parties appear to agree that the statute under which Defendants arrested Plaintiff is California Vehicle Code section 23152. *See* Doc. No. 62 at 17; DSS at 27. Under that statute, it is unlawful for any person "who is under the influence of any alcoholic beverage" or "who has 0.08 percent or more, by weight, of alcohol in his or her blood" to drive a vehicle. Cal. Veh. Code §§ 23152(a)–(b). In everyday language, the law forbids driving under the influence of alcohol ("DUI").

Here, the parties dispute several facts relevant to probable cause. First, the parties disagree as to whether Plaintiff ran a stop sign prior to Dumaplin and Montayre initiating their traffic stop. *See* Dumaplin First BWC 3:00–3:12; Dumaplin Decl. ¶ 11; Pl. Depo. Tr. 50:15–50:16. The body camera footage provided, though beginning prior to their pulling Plaintiff over, does not provide insight into this matter, as the viewer cannot see above the dashboard. *See, e.g.*, Dumaplin First BWC 0:00–1:52. Further, three defendants—Dumaplin, Sowers, and Montayre—declare that Plaintiff displayed physical signs of intoxication, including watery, glassy eyes. Dumaplin Decl. ¶ 12; Sowers Decl. ¶ 12; Doc. No. 46-10 ("Montayre Decl.") ¶ 11 ("[Plaintiff's] eyes were red"). Dumaplin stated in his report that Plaintiff likewise displayed rapid speech and a "lax face/jaw," and that he was "angry," "belligerent," and "yelling," as signs of objective symptoms. Doc. No. 46-26. Plaintiff denies these assertions, though he testified that he may have had one drink at an event prior that day. Dumaplin Second BWC 1:10–1:18; Pl. Depo. Tr. 51:18–

53:4.

However, the Court finds that three facts not genuinely in dispute here are sufficient to conclusively find that the individual defendants had probable cause to arrest Plaintiff for DUI. The first is that Plaintiff was driving erratically when Defendants Dumaplin and Montayre performed their traffic stop. Plaintiff admitted to driving erratically upon contact with Defendants Dumaplin and Montayre, claiming it was because he "dropped his phone." Dumaplin First BWC 3:00–3:12.

Second, based upon the evidence presented, the Court finds that Plaintiff was driving at speed unusually and noticeably fast in the context at hand. Tailing Plaintiff before the traffic stop, Dumaplin and Montayre reached a top speed of 48 miles per hour. Dumaplin First BWC 1:43–1:52. When asked at the scene why he was "going so fast," Plaintiff responded that he "knew [he] was going fast." Dumaplin First BWC 3:16–3:27. In his deposition, Plaintiff testified that he did not know what the speed limit was on the street where he first encountered the individual defendants, but nonetheless testified that he was not exceeding that limit. Pl. Depo. Tr. 50:3–50:11. Plaintiff did not, however, testify as to the actual speed at which he was travelling. *See id.* This sort of conclusory denial is not sufficient to raise a genuine dispute of fact. *See Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 820 n.4 (9th Cir. 2007) ("[B]are assertions of a legal conclusion, not supported by any other 'specific facts showing that there is a genuine issue for trial[]'" are "insufficient to raise a genuine issue of material fact . . . .").

Finally, the Court finds that there is no genuine dispute that Plaintiff's car smelled of alcohol during his interactions with the individual defendants. Three individual defendants—Dumaplin, Sowers, and Montayre—state that they personally smelled alcohol emanating from Plaintiff's car before he exited the vehicle. Dumaplin Decl. ¶ 12; Sowers Decl. ¶ 12; Montayre Decl. ¶ 11. Plaintiff's only apparent evidence in opposition, based on his response to Defendants' Separate Statement of Undisputed Facts, is that Watson did not "recall smelling" alcohol during the encounter, and he argues that Defendant Montayre did not report his observations regarding the alcoholic

odor or Plaintiff's appearance before litigation began.  DSS Nos. 5–7; Doc. No. 62 at 18–19.  This is not evidence raising a genuine dispute for trial, as it does not contradict the evidence Defendants put forward.  Even taken in the light most favorable to Plaintiff, that one officer did not remember the smell of alcohol and that one did not report it until after litigation began does not negate the testimony, declarations, and assertions offered by the other individual defendants sufficient to stave off summary judgment.  *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Viewing the facts in the light most favorable to Plaintiff, the nonmovant, the Court finds that no reasonable jury could find that the individual defendants lacked probable cause to arrest Plaintiff for a DUI.  Though some facts remain disputed, the undisputed facts alone are sufficient to establish at summary judgment that they had probable cause.  Thus, those remaining facts are immaterial.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  At the time of his arrest and immediately prior, the timeframe the Court must consider, the undisputed facts are that Plaintiff was going at a noticeably fast speed, that he was driving "erratically," and that his car smelled of alcohol during his interactions with officers.  Based on this evidence the Court determines that "a reasonably prudent person" would believe that Plaintiff had been driving under the influence of alcohol, regardless of in which direction the immaterial disputed facts fall.  *Rosenbaum*, 663 F.3d at 1076; *Franklin*, 312 F.3d at 438; *see Devermont v. City of Santa Monica*, No. CV 12-06772 DDP MRWX, 2014 WL 2969629 *4 n.4 (C.D. Cal. Jul. 1, 2014) ("Nearly every case that the Court could find in which summary judgment was granted in favor of defendants . . . involved either (1) an undisputed odor of alcohol or drugs emanating from the vehicle or the individual, or (2) an admission by the individual that he or she had recently consumed at least some alcohol or drugs. . . .").  Therefore,

because the undisputed evidence reveals that probable cause existed for Plaintiff's arrest, the Court **GRANTS** Defendants' motion for summary judgment as to the individual defendants as it relates to Plaintiff's false arrest claim.[17]

### 4.    Unlawful Search – Claim 3

Defendants also seek summary judgment on Plaintiff's claim that they violated his Fourth Amendment right against unreasonable searches and seizures when the individual defendants administered the intoxilyzer test, searched his person on the ground after the takedown, and searched his car.  Doc. No. 46-1 at 24.  While "'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation[,]" it does require that, at minimum, "the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation" under circumstances such as these.  *Peck*, 51 F.4th at 891.  Here, the evidence demonstrates that Sowers and Allen administered the intoxilyzer test, with Sowers physically running the machine.  *See generally* Sowers First BWC.  The evidence does not reflect that any of the other individual defendants participated in the intoxilyzer test, and therefore even if Sowers and Allen violated Plaintiff's rights by administering the intoxilyzer test, Dumaplin, Montayre, and Watson would not be liable as they were not integral participants.  *Peck*, 51 F.4th at 891.

Warrantless breathalyzer tests incident to lawful arrest do not violate a driver's Fourth Amendment's rights.  *Danny Birchfield N. Dakota Steve Michael Beylund v. N. Dakota Dep't of Transp.*, 579 U.S. 438, 474 (2016) (hereinafter "*Danny Birchfield*").  The parties appear to agree on this point.  Doc. No. 46-1 at 24; Doc. No. 62 at 20.  Plaintiff's opposition to summary judgment on the issue is that, in his view, his arrest was

---

[17] The Court notes that the individual defendants declare, in nearly identical phrasing, that they believe probable cause supported Plaintiff's arrest for violating California Penal Code § 148(a)(1), regarding delaying or obstructing law enforcement officers in executing their duties.  *See* Montayre Decl. ¶ 15; Sowers Decl. ¶ 15; Dumaplin Decl. ¶ 17; Doc. No. 46-7 ("Watson Decl.") ¶ 15; Allen Decl. ¶ 15.  Because the Court determines probable cause existed to arrest Plaintiff for DUI, it need not analyze whether probable cause existed to arrest him for any other offense.

1   unlawful and that therefore the breathalyzer did not occur incident to a lawful arrest.

2   Doc. No. 62 at 20.  As discussed above, the undisputed facts are sufficient to determine

3   that probable cause existed for Plaintiff's arrest.  Therefore, because the individual

4   defendants had probable cause to arrest Plaintiff, Sowers and Allen did not violate

5   Plaintiff's rights when they administered the test.  Thus, the Court **GRANTS** Defendants'

6   motion for summary judgment as to the individual defendants as it relates to their

7   submitting Plaintiff to a breathalyzer test.

8       The Court similarly dispenses of Plaintiff's allegations that Defendants violated his

9   Fourth Amendment rights when they searched his person on the same grounds.  Here, all

10  individual defendants "integrally participated" in the search.  Each officer, at minimum,

11  held Plaintiff down as the rest searched him after the takedown as the others searched his

12  body.  Sowers Second BWC 5:00–6:13; Montayre BWC 13:10–15:25; Allen Depo. Tr. at

13  4–8;[18] Watson BWC 6:36–7:25; Sowers Depo. Tr. 145:15–145:25; Allen Decl. ¶ 13.

14  These actions, should any of them amount to a constitutional violation, would thus leave

15  all individual defendants liable.  *See Boyd*, 374 F.3d at 780.  However, "[t]he mere fact of

16  the lawful arrest justifies a full search of the person."  *Danny Birchfield*, 579 U.S. at 439

17  (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)) (internal quotation marks

18  omitted).  Indeed, a law enforcement officer's right to search a person incident to lawful

19  arrest exists regardless of the probability that the officer would find weapons or evidence

20  on the arrestee.  *Robinson*, 414 U.S. at 235.  "Where the formal arrest followed quickly

21  on the heels of the challenged search of petitioner's person, we do not believe it

22  particularly important that the search preceded the arrest rather than vice versa."

23  *Rawlings v. Kentucky*, 448 U.S. 98, 110–11 (1980).  Thus, because Plaintiff's arrest was

24  lawful, searching Plaintiff's person before and after the takedown did not violate his

25  Fourth Amendment rights.  The Court therefore **GRANTS** Defendants' motion for

26  summary judgment as it relates to the searching of Plaintiff's person.

27

28

---

[18] *See supra* note 8, regarding pagination citations for Doc. No. 71-2.

Defendants' motion as to the search of Plaintiff's car, however, resolves differently. Defendants argue that Plaintiff's car was searched as part of the inventory process after impoundment, and that this search was lawful. Doc. No. 46-1 at 25. However, Plaintiff does not appear to allege this impound search violated his rights in the operative complaint, nor does he respond to it specifically in his response in opposition. *See generally* Doc. No. 18; Doc. No. 62 at 20. Instead, the search described in the amended complaint is that which occurred at the scene immediately following his arrest. Doc. No. 18 at 5. At summary judgment, the moving party bears the initial burden to demonstrate that there are no genuine disputes as to any material fact, and that they are therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157–60 (1970). Here, Defendants fail to meet their burden because they do not present facts or argument relevant to Plaintiff's actual claim: that the individual defendants violated his rights when they searched his vehicle at the scene of his arrest.[19] Therefore, the Court **DENIES** Defendants' motion for summary judgment regarding their searching Plaintiff's car.

### 5.    *Unlawful Seizure – Claim 4*

Defendants move for summary judgment on Plaintiff's claim that the individual defendants seized his ring, car, driver's license, and bracelet in violation of the Fourth Amendment, arguing that none of these items were "seized" consistent with the Fourth Amendment. Doc. No. 46-1 at 25–26. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Under the circumstances of this alleged seizure, the Court assesses a seizure's reasonableness by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

[19] Incidentally, the evidence put forward does not support that an inventory search of Plaintiff's car occurred. Instead, the evidence merely reflects that Plaintiff's car was impounded and that City policy mandates an inventory search under the circumstances. Doc. No. 55-2 at 2; Doc. 46-30; DSS at 31. But the impound report regarding Plaintiff's car does not indicate any such inventory search occurred. Doc. No. 55-2 at 2.

importance of the governmental interests alleged to justify the intrusion." *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015).

The Court begins with the individual defendants' impounding Plaintiff's car after his arrest. Defendants assert that "[Plaintiff's] vehicle was not 'seized'; it was impounded as the officers were required to do pursuant to San Diego Police Department Procedure 7.08." Doc. No. 46-1 at 25. Defendants make no further argument. *Id*. However, "[t]he impoundment of an automobile is a seizure within the meaning of the Fourth Amendment." *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). Additionally, "[a] seizure conducted without a warrant is per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions. The burden is on the Government to persuade the district court that a seizure comes under one of a few specifically established exceptions to the warrant requirement." *Id.* at 862. Thus, Defendants' argument, at least as the Court understands it, that impounding Plaintiff's vehicle cannot lawfully constitute seizure, is unavailing.

Moreover, under circumstances such as these, where a car is impounded after its driver's arrest for a traffic violation or DUI, courts generally look to the "community caretaking" exception to the Fourth Amendment's warrant requirement as the basis for officers' authority to impound, which allows impoundment and search of a vehicle provided the impoundment both "conform[s] with the standardized procedures of the local police department and [is] in furtherance of a community caretaking purpose, such as promoting public safety or the efficient flow of traffic." *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016); *Miranda*, 429 F.3d at 864; *cf. United States v. Anderson*, 101 F.4th 586, 599 (9th Cir. 2024). "The reasonableness of an impoundment under the community caretaking function does not depend on whether the officer had probable cause to believe that there was a traffic violation . . ." but instead "depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft." *Miranda*, 429 F.3d at 864. In all circumstances, "[t]he government bears the burden of establishing that a vehicle's

impoundment and search are justified under an exception to the warrant requirement." *Torres*, 828 F.3d 1118.

Defendants put forth no undisputed facts as to the decision-making process or circumstances behind the impoundment or as to which of the individual defendants were or were not involved in impoundment. Nor do they assert that they sought or received a warrant to seize Plaintiff's car after his arrest. Looking to the record, Defendant Sowers' report states a basis for the impoundment: that Plaintiff's "vehicle was not parked legally." Doc. No. 46-19 at 4. However, the report does not provide facts as to how the car was parked that would support a conclusion that such positioning was "not legally parked." Likewise, the video evidence does not clearly support that Plaintiff's car was parked unlawfully. Footage demonstrates that Plaintiff pulled over on a residential street, close to the curb, some small distance past a bus sign. Watson BWC at 0:01. This is insufficient to establish that the impound was reasonable as a matter of law.

Further, both Sowers' report and the impound report offered at Doc. No. 55-12, also cite California Vehicle Code section 22651(h)(1), which authorizes police to remove a vehicle when its operator has been lawfully arrested. However, as various courts have held, a state law authorizing blanket impoundment subject to arrest does not make a seizure compliant with the Fourth Amendment. *See Sibron v. New York*, 392 U.S. 40, 61 (1968) ("The question in this Court upon review of a state-approved search or seizure is not whether the search (or seizure) was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment.") (quoting *Cooper v. State of California*, 386 U.S. 58, 61 (1967)); *see also People v. Williams*, 52 Cal. Rptr. 3d 162, 166 (Cal. Ct. App. 2006) ("While [Section 22651(h)(1)] authorizes law enforcement officers to 'remove' a vehicle when they make a custodial arrest of a person 'driving or in control of' the vehicle, this statutory authorization does not, in and of itself, determine the constitutional reasonableness of the seizure.").

Therefore, considering the record, Defendants have not met their initial burden at summary judgment to present undisputed facts that warrant judgment as a matter of law

for any defendant as to this claim. *See* Fed. R. Civ. P. 56(a); *Adickes*, 398 U.S. at 157–60.

Defendants additionally implicitly justify the impoundment on grounds that it complied with department procedure. Doc No. 46-1 at 25. However, the dearth of facts put forward as to the circumstances and rationale surrounding their decision to impound the vehicle leave the Court without basis to determine that this assertion is true. Likewise, the fact that City policy or state law commands an action does not make that action *per se* constitutional. *See Miranda*, 429 F.3d at 864–65; *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978). Given the absence of facts offered in support of their assertion that the impoundment was constitutional, the Court **DENIES** Defendants' motion as it relates Plaintiff's claims that the individual defendants impounded his car in violation of the Fourth Amendment.

The Court next assesses the destruction of Plaintiff's bracelet. Officers have the right to search an arrestee incident to lawful arrest, and to remove and examine the physical items on his person to ensure the arrestee does not possess weapons or means of escape. *See Riley v. California*, 573 U.S. 373, 386–87 (2014). A seizure, though initially lawful, can become unlawful if the manner of seizure unreasonably destroys the item seized. *See Jacobsen*, 466 U.S. at 124–25. Under such circumstances, "[t]o assess the reasonableness of this conduct, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 125. This includes factors such as whether the item was suspicious and likely to be contraband, the degree of destruction, and the impact on the protected property interest. *See, e.g.*, *id.*

Here, the parties agree that Plaintiff's bracelet broke during his arrest but dispute exactly how that occurred. In Plaintiff's telling, Allen broke this item as she searched him, without apparent reason, and she and the other individual defendants left these items on the street. Pl. Depo. Tr. 56:20–57:10, 58:17–59:6; Montayre Depo. Tr. 72:20–73:25; Doc. No. 62 at 15, 21. Defendants assert that the bracelet broke because Plaintiff "[fought] with officers," who then attempted to recover the pieces. DSS at 27–28; Allen

Depo. Tr. 90:4–90:21, 112:24–113:25; Sowers Depo. Tr. 145:3–145:14.  The video evidence, though the viewer can see the bracelet pieces immediately after it broke, does not clarify the degree to which any party applied force to it.  Montayre BWC 14:00–14:11.  Taking the evidence in the light most favorable to Plaintiff, it is possible that a reasonable jury could find that the individual defendants unreasonably, and unprompted, destroyed Plaintiff's bracelet—an item not likely to contain contrabands or weapons—during their search, thereby permanently depriving Plaintiff of his property right to it.  *See, e.g.*, *Jacobsen*, 466 U.S. at 124–25.

However, the Court finds that, unlike Plaintiff's excessive force claim, not all individual defendants were so integrally involved in the seizure of Plaintiff's bracelet such that a reasonable jury could find them liable.  As discussed, to be considered integral participants, "the defendant[s] [must know] about and acquiesce[] in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation" under circumstances such as these.  *Peck*, 51 F.4th at 891.  Unlike the excessive force claim where each individual defendant participated in the series of acts claimed to be excessive through the takedown and holding Plaintiff on the ground, the evidence reflects only one defendant here—Allen—participated in the momentary act that led to the destruction of Plaintiff's bracelet to any degree that a reasonable jury could find knowledge or intent to commit the act.  *See* Pl. Depo. Tr. 56:20–57:10, 58:17–59:6; Montayre Depo. Tr. 72:20–73:25; DSS at 27–28; Allen Depo. Tr. 90:4–90:21, 112:24–113:25; Sowers Depo. Tr. 145:3–145:14; Doc. No. 62 at 15, 21.  Even Plaintiff's statement of undisputed facts names only Allen as breaking his bracelet.  Doc. No. 48-2 at 7.  There are no facts in support of the other individual defendants' having any sort of knowledge that officer Allen would act in a way that a reasonable jury could find exceeded the lawful seizure allowed upon arrest or acquiesced to her having done so.[20]  *Peck*, 51 F.4th at 891 ("Perhaps it was foreseeable that a shooting might take

---

[20] Indeed, Defendant Sowers testified that she helped look for any property left behind at the scene.  Sowers Depo. Tr. 145:3–145:14

place when the deputies arrived on the scene of a 911 call about an encounter in which an individual had brandished a weapon and was behaving erratically. But [the other defendants] had no reason to know that an *unconstitutional* shooting would take place."). Therefore, the Court cannot hold them as integral participants to the seizure.  Thus, the Court **GRANTS** Defendants' motion in favor of Defendants Watson, Dumaplin, Montayre, and Sowers as to the seizure of Plaintiff's bracelet in violation of his Fourth Amendment rights, and **DENIES** it as applies to Defendant Allen.

As to Plaintiff's ring, the Court understands Defendants' argument to be that Plaintiff's allegations do not rise to the level of an unlawful seizure, even if true, as Plaintiff does not allege that Defendants kept his ring after initially removing it.  Doc. No. 46-1 at 26.  The evidence, contained in Plaintiff's deposition transcript, reveals that Defendants placed the ring, after removing it from Plaintiff, into the "console of his car" from which he later retrieved it (and apparently brought it to deposition).  Pl. Depo. Tr. 76:2–76:12.  Indeed, as Defendants state, Plaintiff does not plead that Defendants kept the ring, but merely that they removed it as they searched him.  Doc. No. 18 at 11.  Here, the record does not establish which officer removed the ring from Plaintiff's finger.  However, as with the right to search an arrestee's person, officers have the right to remove and examine the physical items on an arrestee's person incident to arrest to ensure they do not possess weapons or means of escape.  *See Riley*, 573 U.S. at 387.  This being a lawful arrest, the individual defendants had the right to remove Plaintiff's ring during the arrest.  Therefore, the Court **GRANTS** Defendants' motion as it relates to Plaintiff's ring.

Finally, regarding Plaintiff's driver's license, Defendants move for summary judgment on grounds that "[h]is driver's license was eventually returned to him."  Doc. No. 46-1 at 26.  The movant must affirmatively establish that there is no genuine dispute of material facts at summary judgment.  *Adickes*, 398 U.S. at 157–60.  Defendants have identified no undisputed facts or evidence to support their position, and thus the Court **DENIES** their motion for summary judgment as it relates to seizure of Plaintiff's driver's

1  license.

2  **B.    Qualified Immunity**

3       Defendants assert that the individual defendants are entitled to qualified immunity

4  regarding Plaintiff's excessive force and false arrest claims.  Doc. No. 46-1 at 13–23;

5  Doc. No. 53.  "Government officials enjoy qualified immunity from civil damages unless

6  their conduct violates 'clearly established statutory or constitutional rights of which a

7  reasonable person would have known.'"  *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir.

8  2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)).  "To determine whether

9  a government official is entitled to qualified immunity, we ask two questions: whether the

10  official violated a statutory or constitutional right, and whether that right was clearly

11  established at the time of the challenged conduct."  *Ellins v. City of Madre*, 710 F. 3d

12  1049, 1064 (9th Cir. 2013); *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer to

13  both is "yes," the officials in question are not entitled to qualified immunity.  Courts may

14  address either question first.  *Pearson*, 555 U.S. at 236.

15       In determining whether to grant qualified immunity, the Court takes facts in the

16  light most favorable to the party asserting injury.  *Saucier*, 533 U.S. at 201.  At summary

17  judgment, assessing qualified immunity therefore "usually means adopting . . . the

18  plaintiff's version of the facts."  *Scott*, 550 U.S. at 378.  However,  as noted above, when

19  dealing with unaltered video evidence of the events at the heart of the dispute, like here,

20  if "opposing parties tell two different stories, one of which is blatantly contradicted by

21  the record, so that no reasonable jury could believe it, a court should not adopt that

22  version of the facts for purposes of ruling on a motion for summary judgment" and view

23  the facts in the light the video depicts.  *Id.* at 378–81.

24       As no reasonable jury could find that the individual defendants lacked probable

25  cause to arrest Plaintiff and that therefore there is no constitutional violation for false

26  arrest, it is unnecessary to analyze the second prong of qualified immunity for Plaintiff's

27  false arrest claim.  *Saucier*, 533 U.S. at 194 ("If no constitutional right would have been

28  violated were the allegations established, there is no necessity for further inquiries

concerning qualified immunity.").  Thus, the Court must address only the question of qualified immunity regarding Plaintiff's excessive force claim.

The Court discussed Plaintiff's version of the facts regarding his excessive force claim at length above.  As discussed, the Court finds that there are triable facts upon which a jury could find that the individual defendants violated Plaintiff's rights.  The Court now must determine whether the right allegedly violated was "clearly established" at the time, taking the facts in Plaintiff's favor.  "To determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 967 (9th Cir. 2010).  "The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202).  "[T]he right must be defined with specificity," not at "a high level of generality." *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (citations and quotation marks omitted).  While "[i]t is not necessary . . . that the very action in question has previously been held unlawful . . . in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent." *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (citations and quotation marks omitted).  "When this test is properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132–33 (9th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  "The plaintiff 'bears the burden of showing that the rights allegedly violated were clearly established[]'" at the time of impermissible conduct.  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 969 (9th Cir. 2021) (quoting *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017)).  However, when considering this "pure question of law," a court draws on its "'full knowledge' of relevant precedent rather than restricting [its] review to cases identified by the plaintiff." *Id.* (quoting *Elder v. Holloway*, 510 U.S. 510, 516 (1994)).

Though *Graham* itself holds that officers may not use excessive force against an individual during a traffic stop, that generalized principle is insufficient to determine that Defendants in this case were on notice that the specific degree of force Plaintiff alleged they employed against him was reasonable under the circumstances at this stop. *See Saucier*, 533 U.S. at 202–08; *Thompson*, 885 F.3d at 589–90; *see generally Graham*, 490 U.S. at 386. Instead, the Court must determine whether Plaintiff's right not to be forcefully slammed to the ground under the officers' bodyweight and held there under the same during a traffic stop—while he exhibited only passive resistance—was clearly established at the time of the alleged violation.

Plaintiff cites several cases in support of his argument. However, many of the cases do not come in context of a traffic stops. *See, e.g.*, *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007); *Mackovski v. City of Garden Grove*, 666 F. App'x 649 (9th Cir. 2016); *Blankenhorn*, 485 F.3d 463; *Forrester*, 25 F.3d 804; *City of Davis*, 685 F.3d 867; *Meredith*, 342 F.3d 1057. Importantly, "the [Supreme] Court has recognized that traffic stops are 'especially fraught with danger to police officers.'" *See Thompson v. Rahr*, 885 F.3d 582, 589 (9th Cir. 2018) (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). Thus, the Ninth Circuit, interpreting this precedent, has found that traffic stops present a unique context for which district courts must account in determining whether a right was clearly established when it was allegedly violated. *Id.* at 589–90; *see also Smith v. City of Stockton*, 818 F. App'x 697, 699 (9th Cir. 2020).

Therefore, it is unclear whether these cases could be sufficiently similar to the present action to "clearly establish" Plaintiff's relevant rights. The Court notes that in two traffic-stop-based cases cited below, *Orr v. Brame*, 727 F. App'x 265 (9th Cir. 2018) and *Winterrowd v. Nelson*, 480 F.3d 1181 (9th Cir. 2007), the Ninth Circuit found *Meredith*, which Plaintiff cites in his brief, sufficiently analogous to rely upon in traffic stop contexts when denying qualified immunity despite the fact that *Meredith* did not involve a traffic stop. *Orr*, 727 F. App'x. at 268; *Winterrowd*, 480 F.3d at 1186. This Court, too, identifies substantial similarities between the facts in *Meredith* and the instant

action, save for the traffic stop context.  However, both *Orr* and *Winterrowd* were decided prior to the Ninth Circuit's pronouncement in in *Thompson* regarding the difference in context between traffic stops and other police interactions.  885 F.3d at 589–90.  Thus, the Court will not rely on *Meredith* or other non-traffic-stop cases without further guidance from the Ninth Circuit as to the weight it should give this difference in context in its analysis.

Plaintiff cites additional cases involving traffic stops, though all involve somewhat different types of force than those at play here.  *See, e.g.*, *Young*, 655 F.3d. 1156 (involving officer's use of pepper spray and a baton); *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010) (involving officer's use of a stun gun).  In resolving this matter, however, the Court need not determine whether the cases Plaintiff cites are sufficiently analogous to render his rights here clearly established, as it determines that Ninth Circuit precedent as decided in *Winterrowd* is sufficient to determine that the right in question was clearly established.  480 F.3d at 1182–83.

In *Winterrowd*, the Ninth Circuit held that officers' forcing Plaintiff onto the hood of his car and applying pressure to Plaintiff's previously-injured arm constituted excessive force under the circumstances.  Like Plaintiff's account here, "Winterrowd didn't take a swing at the officers, nor did the officers detect suspicious bulges or metallic glints on his person.  According to Winterrowd, he didn't resist the officers, nor did he flee."  *Id.* at 1184; *see also* PSS at 3.  Likewise, similar to Plaintiff here, "[a]t most, Winterrowd was shown to be verbally abusive; after being forced onto the hood of the car, he called the officers 'jackbooted thugs,' 'armed mercenaries' and '[c]owards.'  Assuming that Winterrowd had used such epithets in the past [interactions with the same officers], they would not justify the use of force."  480 F.3d at 1185.

Thus, *Winterrowd* and the case at hand thus share many similarities, from the traffic stop context to the resistance mounted by their respective plaintiffs and the degree of force used.  Indeed, the major difference between *Winterrowd* and the action at hand appears to be the rationale upon which the plaintiffs were stopped: Winterrowd for

expired license plates and refusal to furnish valid registration, while Plaintiff was stopped for speeding and driving erratically and eventually arrested DUI. *Winterrowd*, 480 F.3d at 1184. However, as it relates to use of force purposes, the differences here are minimal. Neither crime evinces a high, or particularly different, justification for use of force. *Id.*; *Lopez*, 2015 WL 4077635 at *8.

One Ninth Circuit opinion has identified *Winterrowd*'s "routine pat-down" nature, versus an arrest, as a relevant point of factual differentiation. *See Spencer*, 117 F.4th at 1142. However, police in both *Winterrowd* and the instant action had probable cause to believe there was some violation of the law, had pulled the driver over, and had ordered him out of his car for a pat-down. Here, officers had not yet placed Plaintiff under arrest at the time they took him to the ground and appear, for all intents and purposes, to have been at the exact same stage of interaction as the *Winterrowd* parties. Taken in the light of other Ninth Circuit decisions applying *Winterrowd*, this Court does not find that this difference is material in the instant action. *See, e.g.*, *Orr*, 727 F. App'x at 269 (upholding a district court's application of *Winterrowd* in a DUI arrest case); *see also Onyenwe v. City of Corona*, 637 F. App'x 370, 371 (9th Cir. 2016) (applying *Winterrowd* in the arrest context, but absent a traffic stop).

Likewise, though there is some difference in the degree of force used, that difference here only serves to militate against granting qualified immunity, as it appears—at least from the description in *Winterrowd*—that the force applied in the instant action constituted a somewhat greater degree of force than the single officer's slamming Winterrowd against the car hood, including in the manner of the individual defendants' taking Plaintiff to the ground. *See Winterrowd*, 480 F.3d at 1183–84. As another example, unlike here, the application of force in *Winterrowd* did not include applying substantial bodyweight on top of an arrestee while already handcuffed and on the ground, after being forcefully taken down. *Id.* at 1183. Thus, it should be clear to a reasonable person that a greater degree of force could not be more permissible when less was unlawful, especially when Plaintiff was already in handcuffs. *See Spencer*, 117 F.4th

1130 at 1144.  Officers in *Winterrowd*, "no doubt had an interest in confirming that Winterrowd was unarmed, but they had no justification for doing so in a physically abusive manner[.]"  *Winterrowd*, 480 F.3d at 1186.  The same applies here.

In summary, the individual defendants in the instant action should have been on notice that, given *Winterrowd*, Plaintiff's passive resistance—arguing with them and cursing at them as they handcuffed him—could not warrant even the same degree of force as the *Winterrowd* plaintiff's "verbal[] abus[e]." *Id.* at 1185.  The respective defendants had no indication that Winterrowd nor Plaintiff here carried weapons, nor did either attempt to flee.  Both were arrested for crimes that presented little reason to employ force.  Despite the similarities in facts pertinent to the reasonableness of force, the individual defendants utilized force against Plaintiff not only like that in *Winterrowd*, but ostensibly force of an even greater degree even though here, Plaintiff was already handcuffed when the takedown occurred.  *See Glenn*, 673 F.3d at 871 (setting forth factors relevant to the "reasonableness" of use of force); *Mattos*, 661 F.3d at 441 (same); *Lal*, 746 F.3d at 1117 (same).  Given these similarities, the Court determines that Plaintiff's right not to be forcefully slammed to the ground under the officers' bodyweight and held there under the same during a traffic stop—all the while doing no more than passively resisting—was clearly established at the time of the alleged violation.  Thus, the individual defendants are not entitled to qualified immunity and the Court **DENIES** their motion for summary judgment regarding Plaintiff's excessive force claim.

**C.   Municipal Liability**

Next, Defendants seek summary judgment on Plaintiff's claim for municipal liability under *Monell* against the City.[21]  Defendants argue that Plaintiff, bearing the

---

[21] It is not entirely clear based on Plaintiff's pleading for what constitutional violations he hopes to hold the City liable.  *See* Doc. No. 18 at 12–15.  Based on the allegations therein and the parties' summary judgment briefing as discussed below, the Court concludes that Plaintiff seeks municipal liability regarding his excessive force and false arrest claims.  *Id.*; Doc No 46-1 at 26–29; Doc. No. 62 at 21–23.

burden of proof on this claim and after opportunity for discovery, will be unable to make a showing sufficient to establish the elements of his claim such that there will be no genuine issue as to any material fact, pursuant to *Celotex Corp.*, 477 U.S. at 322–23. Under such circumstances, Plaintiff now must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.

First, as the Court has determined that Plaintiff's arrest was lawful and did not violate his constitutional rights, Plaintiff cannot establish municipal liability based upon that claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*). Accordingly, the Court **GRANTS** Defendants' motion to the extent Plaintiff brings his *Monell* claim based upon any policy or custom regarding false arrests.

To establish the City's liability regarding Plaintiff's excessive force claim, he "must establish that (1) [the individual defendants'] use of [force] amounted to an unconstitutional application of excessive force, and (2) the City's policy caused the constitutional wrong." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). Though described in a variety of manners, there are three overarching theories by which a plaintiff can establish existence of a policy or custom sufficient to invoke municipal liability under *Monell*:

> [(1)] if execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicted the injury . . . [(2)] a local government can fail to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right, such that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need . . . [(3)] if 'the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Rodriguez v. City of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018) (internal citations

and quotation marks omitted).

A "plaintiff may prove the second type of *Monell* liability, deliberate indifference, through evidence of a failure to investigate and discipline employees in the face of widespread constitutional violations. Thus, it is sufficient under our case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity." *Id.* (internal citations omitted).

In an effort to demonstrate that "Defendant City of San Diego has a custom or practice that contributes to a failure to train or failure to supervise employees and amounts to deliberate indifference to constitutional rights," Doc No. 62 at 21–23, Plaintiff offers evidence of three settlements between the City of San Diego and other plaintiffs in three cases in this district concerning incidents involving San Diego Police Department officers in 2016 and 2018. *See McNally v. Riis*, et al., Case No. 18-cv-1150-CAB-AGS; *Adan v. City of San Diego, et al.*, Case No. 19-cv-1523-LAB-AHG; *Ball v. City of San Diego, et al.*, Case No. 21-cv-0498-GPC-BGS.[22] While courts allow plaintiffs to use prior, similar incidents to demonstrate that a certain pattern of incidents evidences a custom with the force of law, they have found in various *Monell* contexts that "[a] custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.' Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified on other grounds by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). As such, the Ninth Circuit has routinely found one or two prior incidents is insufficient to sustain a claim. *Id.* at 918 (collecting cases); *see Hyde v. City of Wilcox*, 23 F.4th 863, 874–75 (9th Cir. 2022) ("While deliberate indifference can be inferred from a single incident when 'the unconstitutional

---

[22] In his amended complaint, Plaintiff alleges additional incidents ostensibly in support of his *Monell* claims, but does not provide evidence regarding those incidents, or items of which the Court could take judicial notice, at summary judgment. Doc. No. 18 at 14–15.

consequences of failing to train' are 'patently obvious' . . . an inadequate training policy itself cannot be inferred from a single incident.") (internal citations omitted); *see also Oyenik v. Corizon Health Inc.*, 696 F. App'x 792 (9th Cir. 2017) (collecting cases).

Here, the Court determines that the evidence offered is insufficient to allow a reasonable jury to find that there was any specific custom or policy in use or in force by the City. The Court notes that one case cited does not include an excessive force claim or facts amounting to one. *Adan v. City of San Diego, et. al*, 19-cv-1523-LAB-AHG at Doc. No. 1.[23] Thus, it is unclear how this case has any relevance to Plaintiff's excessive force claim. Likewise, the arrest in question, at least as the plaintiff in that case alleged it, revolves around a dispute over that plaintiff's right to film police officers. *id* ¶¶ 11–58. The second case, involving both false arrest claims and excessive force claims, at least includes both claims Plaintiff here alleges, though involved an alleged unprompted assault by San Diego police on an unsuspecting civilian. *McNally v. Riis*, 18-cv-1150-BEN-AGS at Doc. No. 1. The final case involves claims that officers arrested the plaintiff in his bedroom, and then later, in jail, knocked the plaintiff onto the ground during booking. *Ball v. City of San Diego*, et al., 21-cv-0498-GPC-BGS at Doc. No. 1.

Thus, even in the light most generous to Plaintiff, no reasonable jury could find that the three offered cases, without any other supporting evidence, establish a custom so "'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Trevino*, 99 F.3d at 918. They simply are too few and temporally scattered to allow a reasonable jury to find any pattern that could sustain municipal liability. *See, e.g.*, *Est. of Wilson by & through Jackson v. Cnty. of San Diego*, No. 3:20-CV-00457-RBM-DEB, 2023 WL 8360718 *34–35 (S.D. Cal. Dec. 1, 2023), *aff'd* sub nom. *Jackson v. Germono*, No. 23-4408, 2024 WL 4144074 (9th Cir. Sept. 11, 2024) (finding the

---

[23] Reviewing the pleadings (as the case settled prior to verdict or dispositive motions), the Court finds one conclusory sentence mentioning excessive force: "As a result of the excessive force Defendant Officers applied against Mr. Adan, Mr. Adan suffered a loss of liberty and emotional trauma." 19-cv-1523-LAB-AHG at Doc. No 1 ¶ 19. The plaintiff, however, did not describe what "excessive force" he believes occurred, and did not allege excessive force as a cause of action.

plaintiff's three cited cases similar because they occurred within three months of one another—mere months before the incident initiating the case—and all involved the same county medical provider "failing to review medical charts prior to making medical decisions.").

Moreover, Plaintiff presents no evidence or argument to establish the second element of *Monell* liability: that the policy or custom was the "moving force" behind the alleged constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Therefore, even if Plaintiff could prove that the City failed to train its officers to an extent that amounted to deliberate indifference to his constitutional rights, he fails to raise a triable issue of fact as to the second *Monell* element.[24] Thus, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiff's *Monell* claim.

## D.   Punitive Damages

Finally, Defendants move the Court to preclude Plaintiff from seeking punitive damages in this action, arguing that he cannot make a showing sufficient to meet the California state law standard for punitive damages. Doc. No. 46-1 at 31–32. However, as Plaintiff notes, punitive damages in a Section 1983 case are not governed by state law standards, but instead may be awarded should a plaintiff prove "reckless or callous disregard for the plaintiff's rights . . . [or] intentional violations of federal law[.]" *Smith v. Wade*, 461 U.S. 30, 51 (1983); *Dang v. Cross*, 422 F.3d 800, 807–11 (9th Cir. 2005) (adding, in addition, "malicious, wanton, or oppressive acts or omissions . . . ."). Given that triable issues remain as to whether and if so, to what extent the individual defendants exercised excessive force against Plaintiff, a reasonable jury could find that the unlawful acts were carried out with reckless or callous disregard for Plaintiff's rights, or amount to an intentional violation of the law. *See Smith v. Cnty. of Orange*, 678 F. Supp. 3d 1182, 1215 (C.D. Cal. 2023), *appeal dismissed* sub nom. *Smith v. Packham*, No. 23-55641,

---

[24] The Court notes that Defendants, however, present evidence that the individual defendants all received training on probable cause and appropriate use of force. *See* Allen Decl. ¶¶ 2–10; Watson Decl. ¶¶ 2–10; Dumaplin Decl. ¶¶ 2–10; Montayre Decl. ¶¶2–10; Sowers Decl. ¶¶ 2–10.

2023 WL 9291578 (9th Cir. Dec. 6, 2023) ("This Court 'is not inclined to take the question of punitive damages out of the factfinder's hands where there are still viable claims for, among other things, an unreasonable seizure and excessive force . . . .'") (citing *Johnson v. Cnty. of San Bernardino*, No. EDCV 18-2523-GW-AFMX, 2020 WL 5224350 *30 (C.D. Cal. Jun. 24, 2020) and *Fortson v. City of Los Angeles*, 628 F. Supp. 3d 976, 995–96 (C.D. Cal. 2022)); *cf. Hernandez*, 897 F.3d at 1132–33 ("[Qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'") (quoting *Ashcroft*, 563 U.S. at 743).

Additionally, as Defendants offer nothing beyond conclusory statements that Plaintiff cannot seek punitive damages under California law—and in their reply, a conclusory statement that Plaintiff does not meet the standard for punitive damages under their approximation of the federal standard—the Court finds that Defendants have not met their burden. Accordingly, the Court **DENIES** Defendants' motion for summary judgment regarding Plaintiff's request for punitive damages.

## VI. MOTION TO FILE UNDER SEAL

Defendants move to seal a number of exhibits to their motion for summary judgment. Doc. No. 47. Based upon their motion, the Court understands those documents to be Exhibits 3, 5, 9, 10, 11, 16, and 17 to their motion for summary judgment—video camera footage of the events in question. "Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7 (1978)). This is "because court records often provide important, sometimes the only, bases or explanations for a court's decision." *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025 (9th Cir. 2014) (quotation marks omitted).

Accordingly, when considering a request to seal, "a strong presumption in favor of access" is generally a court's "starting point." *United States v. Bus. of Custer Battlefield Museum & Store*, 658 F.3d 1188, 1194 (9th Cir. 2011) (quoting *Kamakana*, 447 F.3d at

1178).  For filings more than tangentially related to the case's merits, as here, that presumption can be overcome only by a showing of a "compelling reason," that "outweigh[s] the general history of access and the public policies favoring disclosure." *Id.* at 1194–95; *Settrini v. City of San Diego*, No. 320CV02273RBMBGS, 2022 WL 6785755 *1 (S.D. Cal. Oct. 11, 2022).

Defendants claim that the documents should be sealed because they

> Are subject to the stipulated Protective Order . . . agreed to by the parties and Granted by this Court. The [d]ocuments contain the confidential, private information of the Defendant Officers to include specific information regarding their identities.  Further, the Documents to be Sealed are confidential because they contain privileged Official Information acquired in confidence by a police officer in the course of his duty that was not open, or officially disclosed, to the public prior to the time the claim of privilege was made.

Doc. No. 47-1 at 4.  Defendants likewise assert that

> due to the graphic and sensational nature of the contents of the videos (to wit: an alleged police excessive force incident) there is a distinct possibility that their contents, if made public, will be used for improper purposes by media outlets and or private individuals as this matter has yet to be adjudicated on the merits.  Therefore, it is critical that these materials remain confidential and not be placed in the public file.

*Id.* at 5.

These arguments repeat, effectively verbatim, those rejected in *Settrini*.  2022 WL 6785755 at *2.  Here, as in *Settrini*, Defendants fail to meet their burden to show compelling reason that the documents be sealed.  First, "the Court notes that one party's designation of a document as 'Confidential' does not, standing alone, demonstrate that the documents should be shielded from public access . . . ."  *Id.* (collecting cases). Second, it is unclear what privacy concerns Defendants seek to avoid.  The individual defendants' names are already publicly accessible by virtue of this suit.  While a viewer

can catch glimpses of the individual defendants' faces throughout the body worn video, their faces are largely obscured by surgical-style masks.  *See generally* Sowers BWC; Sowers Second BWC; Watson BWC at 2:00–6:35.  Thus, there is little risk of identification by the average person.

Additionally, the mere fact that content is sensitive does not support sealing it, especially where that evidence is highly probative to the case.  *Settrini*, 2022 WL 6785755 at *2 (quoting *Narciso v. Cnty. of San Diego*, No. 20CV116-LL-MSB, 2022 WL 3447509 *11 (S.D. Cal. Aug. 17, 2022)).  Likewise, though Defendant imagines potential future misuse due to the nature of the incident alleged, Defendant provides no specifics, and does not address the public's interest in law enforcement activity.  *Id.*; *Cheatum v. City of San Diego*, No. 18-CV-1703-BTM-AGS, 2019 WL 3817954 *2 (S.D. Cal. Aug. 14, 2019) ("[T]he Court is concerned that such records are of significance to the public, who has an interest in the activity of law enforcement and its use of force.") (concerning similar arguments to seal body worn camera footage); *Narciso*, 2022 WL 3447509 at *11.

Finally, Defendants assert "Official Information" privilege as a basis for sealing.  However, individuals seeking to invoke official information privilege must make a strong, affirmative showing that includes:

> (1) an affirmation that the agency generated or collected the material at issue and has maintained its confidentiality; (2) a statement that the official has personally reviewed the material in question; (3) a specific identification of the governmental or privacy interests that would be threatened by disclosure of the material to plaintiff and/or his lawyer; (4) a description of how disclosure subject to a carefully crafted protective order would create substantial risk of harm to significant governmental interests if disclosure were made.

*Rogers v. Giurbino*, 288 F.R.D. 469, 481 (S.D. Cal. 2012).  Here, the affidavit Defendants submit in support contains, at most, a cursory statement that the materials are "confidential."  *See* Doc. No. 47-2.  Therefore, the official information privilege does not

apply.  Thus, Defendants have not met their burden to demonstrate compelling reasons to seal the items requested, and the Court therefore **DENIES** Defendants' motion to seal.

## VII. CONCLUSION

For the reasons above, the Court **GRANTS IN PART** Defendants' motion for summary judgment.  The Court **GRANTS** summary judgment as to Plaintiff's sixth cause of action, deliberate indifference to serious medical need, and second cause of action, false arrest, in favor of all Defendants.  The Court likewise **GRANTS** Defendants' motion for summary judgment as to Plaintiff's fifth cause of action, municipal liability for an unlawful custom or practice, in favor of the City.

The Court **GRANTS** Defendants' motion for summary judgment regarding Plaintiff's third cause of action, unlawful search, as it relates to the individual defendants' submitting Plaintiff to a breathalyzer test and searching his person incident to arrest.  The Court **DENIES** Defendants' motion for summary judgment on this cause of action as it relates to the individual defendants' searching Plaintiff's car at the scene of his arrest.

The Court **GRANTS** Defendants' motion for summary judgment regarding Plaintiff's fourth cause of action, unreasonable seizure of property, as to the individual defendants' seizing Plaintiff's ring and as to Defendants Dumaplin, Montayre, Sowers, and Watson in their seizing Plaintiff's bracelet.  It **DENIES** Defendants' motion on this cause of action as to Defendant Allen's seizing Plaintiff's bracelet, as to all individual defendants in their seizing Plaintiff's driver's license, and as to all individual defendants in their impounding Plaintiff's car.

The Court **DENIES** Defendants' motion for summary judgment on Plaintiff's first cause of action, excessive force, as to the individual defendants.  The Court likewise **DENIES** the individual defendants' invocation of qualified immunity.

Finally, the Court **DENIES** Plaintiff's motion for partial summary judgment in its entirety and **DENIES** Defendants' motion to file under seal.

As the remaining claims must proceed to trial, the Court will issue a separate pretrial scheduling order setting all pertinent deadlines and hearings, including a trial

date, in due course.  In the interim, the Court **DIRECTS** the parties to jointly contact the chambers of the assigned magistrate judge <u>within five business (5) days of the date this Order is filed</u>, for the purpose of scheduling a mandatory settlement conference at the convenience of Magistrate Judge Valerie E. Torres.

**IT IS SO ORDERED**.

Dated:  December 26, 2024

HON. MICHAEL M. ANELLO
United States District Judge